IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: VTRAN MEDIA TECHNOLOGIES, LLC PATENT LITIGATION | : : : | MDL DOCKET NO. 1948 |
| VTRAN MEDIA TECHNOLOGIES, LLC v. ATLANTIC BROADBAND FINANCE, LLC d/b/a ATLANTIC BROADBAND, et al. | : : : : : : | CIVIL ACTION NO. 08-3050 |

**MEMORANDUM AND ORDER**

Kauffman, J.                                                                                                           November 3 , 2008

Now before the Court is Defendant Cablevision Systems Corporation's Motion to Dismiss for Lack of Subject Matter Jurisdiction (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(1). For the reasons discussed below, the Motion will be denied.

**I. BACKGROUND**

The instant action is one of multiple patent infringement lawsuits filed by Plaintiff VTran Media Technologies, LLC ("Plaintiff") against various Defendants, including Cablevision Systems Corporation ("Cablevision"). Plaintiff asserts infringement of one or more claims of two patents: U.S. Patent Nos. 4,890,320 (the "'320 Patent") and 4,995,078 (the "'078 Patent"), and seeks monetary damages as well as injunctive relief to prevent further infringement.[1]

---

[1] Plaintiff alleges that it is the assignee of all rights, title and interest in the '320 Patent and the '078 Patent (collectively, the "Patents-in-Suit").

-1-

The infringement actions originally were filed in multiple districts throughout the United States. On April 21, 2008, while the action was pending before the Honorable William W. Caldwell in the United States District Court for the Middle District of Pennsylvania, Cablevision filed the instant Motion. On June 9, 2008, the Judicial Panel on Multidistrict Litigation transferred the various actions to this Court for pretrial management purposes. At a scheduling conference held on September 9, 2008, the parties requested additional time to file supplemental briefing on the Motion, which has now been completed. Cablevision's Motion is based on the assertion that Plaintiff does not have the complete ownership interests in the Patents-in-Suit.

The following background facts are undisputed: the '320 Patent issued on December 26, 1989, and the '078 Patent issued on February 19, 1991. Both patents are entitled "Television Broadcast System for Selective Transmission of Viewer-Chosen Programs at Viewer-Requested Times" and list H. Vincent Monslow ("Monslow") and Steven R. Dickey ("Dickey") as inventors. Pursuant to a Patent Ownership Agreement dated January 5, 1988, Monslow and Dickey agreed that "[a]ll the net proceeds derived from the sale, licensing, use and/or other disposition" of the Patents-in-Suit would be divided between them as follows: Monslow would receive 85% of all proceeds, and Dickey would receive the remaining 15%. 1988 Patent Ownership Agreement, attached to Def.'s Mot. at Ex. O. The 1988 Patent Ownership Agreement subsequently was recorded with the United States Patent and Trademark Office ("USPTO").

By an assignment <u>nunc pro tunc</u> dated April 13, 2005, Monslow assigned a 15% ownership interest in the Patents-in-Suit to J. Bret Armatas ("Armatas"), leaving Monslow with a 70% ownership interest, Dickey with a 15% ownership interest, and Armatas with a 15% ownership interest. 2005 Assignment <u>Nunc Pro Tunc</u>, attached to Def.'s Mot. at Ex. P. The

assignment confirmed a 1988 verbal agreement between Monslow and Armatas and was recorded with the USPTO.

On July 31, 2006, Monslow, Sue A. Dickey ("Ms. Dickey"),[2] and Armatas executed assignment agreements purporting to assign the Patents-in-Suit to a buyer to be determined at the Fall 2006 Ocean Tomo Intellectual Property Auction. 2006 Assignment Agreements, attached to Def.'s Mot. at Ex. R. On October 26, 2006, Concert Media Technology Corporation ("Concert") purchased the rights to both Patents-in-Suit. This assignment was recorded with the USPTO.

In an Assignment of Patent Rights dated October 9, 2007, Concert purported to assign "all right, title, and interest" in the Patents-in-Suit to Plaintiff. 2007 Assignment of Patent Rights, attached to Def.'s Mot. at Ex. Z.

## II. LEGAL STANDARD

"Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim." Samsung Elecs. Co. v. ON Semiconductor Corp., 541 F. Supp. 2d 645, 648 (D. Del. 2008).[3] When considering a motion to dismiss pursuant to Rule 12(b)(1), the Court must first consider

---

[2] Dickey died intestate on February 12, 1999. Although the parties disagree as to whether and how Ms. Dickey, his wife, came to possess his interests in the Patents-in-Suit, it is undisputed that Ms. Dickey executed the assignment agreement on July 31, 2006.

[3] Although the law of the Federal Circuit governs substantive patent law issues, procedural issues not specific to patent law are governed by the law of the regional circuit. See, e.g., Madey v. Duke Univ., 307 F.3d 1351, 1358 (Fed. Cir. 2002) ("On procedural issues, this Court follows the rule of the regional circuit, unless the issue is unique to patent law and therefore exclusively assigned to the Federal Circuit." (citing Nat'l Presto Indus., Inc. v. W. Bend Co., 76 F.3d 1185, 1188 n.2 (Fed. Cir. 1996))). Accordingly, Third Circuit law governs the legal standard for the 12(b)(1) Motion.

whether the defendant is presenting a "facial attack" or a "factual attack" to subject matter jurisdiction. When considering a "facial attack," in which the defendant argues that the facts alleged in the pleadings fail to establish jurisdiction, the Court "looks only at the allegations in the pleadings and does so in the light most favorable to the plaintiff." United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)). In contrast, when considering a "factual attack," in which the defendant challenges the factual assertions made in the plaintiff's pleadings, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Mortensen, 549 F.2d at 891. To resolve a "factual attack" to subject matter jurisdiction, the Court may "consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997).

Because Cablevision challenges the factual assertions made in the Complaint, the Court will consider its challenge to be a "factual attack" upon subject matter jurisdiction. "The plaintiff has the burden of persuasion to convince the court it has jurisdiction." Gould Elecs., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000). In order to meet its burden, Plaintiff must establish jurisdiction by a preponderance of the evidence. See, e.g., Doe v. Goldstein's Deli, 82 F. App'x 773, 775 (3d Cir. 2003) (citing Gould, 220 F.3d at 178).

In order to establish standing in a patent infringement action, all co-owners of the patent must join the action as plaintiffs. See, e.g., Israeli Bio-Eng'g Project v. Amgen, Inc., 475 F.3d 1256, 1264 (Fed. Cir. 2007) ("Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing."); Ethicon, Inc. v.

U.S. Surgical Corp., 135 F.3d 1456, 1468 (Fed. Cir. 1998) ("[A]s a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiffs in an infringement suit.").[4]  If all co-owners are not joined to the action, the Court must dismiss the action for lack of standing. See, e.g., Israeli Bio-Eng'g Project, 475 F.3d at 1264-65 ("Absent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing.").

**III.  DISCUSSION**

Cablevision raises three arguments premised on Plaintiff's alleged failure to obtain exclusive ownership of the Patents-in-Suit, thus requiring dismissal because all co-owners of the Patents-in-Suit are not parties to this action.  First, Cablevision argues that in a recent divorce proceeding, Monslow testified that he had assigned the Patents-in-Suit to L.P. Matthews, an intellectual property search firm, prior to the Ocean Tomo auction, thus calling into question Monslow's ability to assign the Patents-in-Suit to Concert.  Second, Cablevision maintains that there is no record evidence to explain whether and how Dickey's interests in the Patents-in-Suit were transferred to Ms. Dickey, and even if such interests were transferred, whether she was the sole recipient of those interests.  Third, Cablevision argues that Plaintiff has failed to establish whether and how an ownership interest was transferred from Monslow's father to any of the individuals who assigned the Patents-in-Suit to Concert.

---

[4]  The Ethicon court identified two exceptions to this rule.  "First, when any patent owner has granted an exclusive license, he stands in a relationship of trust to his licensee and must permit the licensee to sue in his name." 135 F.3d at 1468 n.9.  "Second, the obligation may arise by contract among co-owners.  If, by agreement, a co-owner waives his right to refuse to join suit, his co-owners may subsequently force him to join in a suit against infringers." Id.  Plaintiff does not argue that either exception applies in the instant action.

### A. L.P. Matthews

Cablevision argues that based on Monslow's May 2007 testimony in a proceeding related to his divorce, a "gap" in the chain of title exists with respect to L.P. Matthews. As part of that proceeding, Monslow testified, "Not long before the Ocean Tomo auction—when I say not long before, maybe a year or two, there was an assignment of the patents to an intellectual property . . . search firm . . . called L.P. Matthews." May 7, 2007 Dep. of H. Vincent Monslow ("Monslow Dep.") 36, attached to Def.'s Mot. at Ex. U. Later, as part of same proceeding, Monslow's counsel stated in court that Concert threatened to rescind the sale of the Patents-in-Suit because of, <u>inter</u> <u>alia</u>, the assignment to L.P. Matthews and the concern that "if [Monslow] didn't get that back from them and can't get it back from them, then that will rescind the sale." May 24, 2007 Tr. 9, attached to Def.'s Mot. at Ex. Y. Cablevision argues that Plaintiff has failed to establish if and how the assignment was transferred from L.P. Matthews back to Monslow prior to the Concert sale. Because it believes the record is unclear as to what rights Monslow held at the time of the purported assignment to Concert, Cablevision argues that Plaintiff has not met its burden to demonstrate that all patent owners are present in the instant action.

Plaintiff explains that the assignment to L.P. Matthews was conditional on its ability and willingness to enforce the Patents-in-Suit. The March 15, 2005 Patent Assignment Agreement between Monslow, Ms. Dickey, and Armatas provides that L.P. Matthews' complete ownership interest in the Patents-in-Suit will revert to the assignors "[i]f, at any time after the execution of this Agreement, [L.P. Matthews] determines that it does not intend to, or cannot reasonably, pursue licensing and enforcement of the Patents." March 2005 Patent Assignment Agreement § 9.1.2, attached to Pl.'s Resp. at Ex. F. When L.P. Matthews decided that it could not pursue

licensing and enforcement of the Patents-in-Suit, the conditional interest reverted back to Monslow, Ms. Dickey, and Armatas. Feb. 27, 2007 Aff. of H. Vincent Monslow ("Monslow Aff.") ¶ 6, attached to Pl.'s Resp. at Ex. I; Mar. 2, 2007 Aff. of Sue Ann Dickey ("Dickey Aff.") ¶ 9, attached to Pl.'s Resp. at Ex. J; Mar. 5, 2007 Aff. of J. Bret Armatas ("Armatas Aff.") ¶ 5, attached to Pl.'s Resp. at Ex. K. The reversion was formalized in a July 27, 2006 Patent Assignment from L.P. Matthews to Monslow, Ms. Dickey, and Armatas. July 2006 Patent Assignment, attached to Pl.'s Resp. at Ex. H.

Cablevision argues that despite the written assignment to L.P. Matthews and the written reversion back to Monslow, Ms. Dickey, and Armatas, a "fatal flaw" exists in Plaintiff's submissions because "[t]he Patent Assignment from L.P. Matthews does not state whether L.P. Matthews owned 100% of the Patents-In-Suit as of July 27, 2006, or whether it had assigned or licensed the Patents-In-Suit to any third parties." Def.'s Reply 12. The Patent Assignment, however, addresses this concern, stating that it "includes the <u>entire</u> right, title and interest in and to the Patents, including without limitation, the right to sue for past, present and future infringement . . . ." July 2006 Patent Assignment 1-2 (emphasis added).[5] If L.P. Matthews had assigned or licensed the Patents-in-Suit, it could not have assigned the entirety of the Patents-in-Suit back to Monslow, Ms. Dickey, and Armatas. Further, Monslow's affidavit states his understanding and belief that L.P. Matthews "did not sell, transfer, assign or otherwise encumber

---

[5] The Patent Assignment also describes the reversion as 70% to Monslow, 15% to Ms. Dickey, and 15% to Armatas, the exact interests the three owners had assigned conditionally to L.P. Matthews in 2005. July 2006 Patent Assignment. Because L.P. Matthews could not assign more than it owned at the time of the reversion, its assignment of the full 100% interest lends further support to the conclusion that L.P. Matthews did not transfer any interest in the Patents-in-Suit prior to the reversion.

in any manner the Patents during the time the Patents were conditionally assigned to L.P. Matthews, LLC." Monslow Aff. ¶ 8; see also Armatas Aff. ¶ 7 (making the same assertion).

Unsatisfied with the documentary evidence Plaintiff has produced, Cablevision asserts that Plaintiff's failure to obtain a "simple declaration from L.P. Matthews concerning whether it held 100% of the interests of the patents it assigned at the time of the agreement" necessitates dismissal for lack of jurisdiction. Def.'s Sur-Sur-Reply 6. Cablevision's argument misapprehends the burden of establishing jurisdiction in response to a 12(b)(1) motion. Plaintiff need not prove beyond any doubt that jurisdiction exists. Rather, the appropriate standard is a preponderance of the evidence, and Plaintiff's submissions—written documentation reflecting both the complete assignment to L.P. Matthews and the complete reversion to Monslow, Ms. Dickey, and Armatas, as well as affidavits confirming that the reversion was total—satisfy this standard.[6] Despite Cablevision's vague assertion that "ambiguities" exist as to the L.P. Matthews transfer, the Court concludes that the evidence produced is sufficient to survive Cablevision's challenge.

**B. Ms. Dickey**

Cablevision contends that the record is unclear as to whether Ms. Dickey came to possess Dickey's interests. Again, Cablevision points to the statement of Monslow's counsel that Concert had threatened to rescind the sale of the Patents-in-Suit because of, inter alia, questions

---

[6] Indeed, the only evidence in the record undermining Plaintiff's assertion is the statement by Monslow's counsel that Concert was concerned about, inter alia, the impact of the L.P. Matthews transfer on the chain of title. Nevertheless, despite any concerns Concert may have had about the chain of title, the sale was not rescinded, and the Court finds that this single comment is insufficient to outweigh the documentary evidence produced to establish that L.P. Matthews transferred full and complete ownership back to Monslow, Ms. Dickey, and Armatas.

over the "change of title from Steve Dickey to Sue Dickey." May 24, 2007 Tr. 7. According to Cablevision, the question about this change in title undermines Plaintiff's argument that it alone holds the Patents-in-Suit: if Ms. Dickey did not receive full and complete ownership of the Patents-in-Suit, she could not have transferred full ownership to Concert.

Plaintiff responds that the January 5, 1988 Patent Ownership Agreement between Monslow and Dickey forbade Dickey from licensing, selling, assigning, or otherwise disposing of his interests without prior written consent of Monslow. 1988 Patent Ownership Agreement. In her affidavit, Ms. Dickey states, "To the best of my knowledge, prior to his death, Steven R. Dickey did not license, sell, transfer, assign, or in any manner encumber or convey to any party any portion of his right, title, or interest in and to the '320 patent, the '078 patent, or [the foreign counterparts to these patents]." Dickey Aff. ¶ 5. Accordingly, Plaintiff argues, Dickey possessed his complete interests in both patents prior to his death.

Plaintiff explains further that on February 12, 1999, Dickey died intestate with four potential heirs: Ms. Dickey and his three adult children. See August 9, 2000 Decree of Descent ¶¶ 6-8, attached to Pl.'s Resp. at Ex. D. Because Dickey's three adult children executed disclaimers "disclaiming any and all interests in the property of Steven R. Dickey," and because the District Court of Johnson County, Kansas, Family Department, Probate Section approved these disclaimers, Ms. Dickey was the sole remaining heir at law. Id. ¶ 9. Accordingly, as found by the District Court of Johnson County, "[t]he Kansas property of the decedent, subject to any lawful disposition previously made, should be assigned and distributed under the laws of intestate succession as follows: To Sue Ann Dickey, sole heir - 100%." Id. ¶ 12. Accordingly, Plaintiff contends that the record is clear as to how the complete interest passed from Dickey to

Ms. Dickey.

Cablevision, however, contends that the Decree of Descent raises additional questions as to the chain of title. First, Cablevision points out that the Decree of Descent refers to the '078 Patent specifically in describing Dickey's property, id. ¶ 10(d), but does not refer to the '320 Patent.[7] Cablevision argues that the absence of a reference to the '320 Patent suggests that Dickey may have disposed of his ownership in the '320 Patent prior to his death. If so, Cablevision continues, Ms. Dickey had no interest in the '320 Patent and could not have transferred an interest to Concert, which in turn could not have transferred an interest to Plaintiff.

Cablevision's speculation as to why the '320 Patent was omitted from the Decree of Descent lacks any support in the record.[8] Cablevision asks Plaintiff to prove a negative—that Dickey never sold or assigned the Patents-in-Suit prior to his death—without explaining what other evidence would satisfy Plaintiff's burden. As explained above, Dickey agreed not to assign his interests in the Patents-in-Suit without obtaining written permission of Monslow. Monslow's affidavit does not mention any instance in which Dickey sought permission to assign his interests and in fact states that Ms. Dickey became the sole heir to his interests in the Patents-in-Suit after

---

[7] Although the '320 Patent is not referenced specifically, the Decree of Descent has a residual clause providing that "[t]he title to all of the interest of the decedent, in and to the property above described and all other property owned by the decedent on the date of death" shall pass to Ms. Dickey. Decree of Descent ¶ 12B; see also Dickey Aff. ¶ 7 ("Although the Decree of Descent only lists the '078 patent . . . the '320 patent and any [foreign counterparts] that may still have existed at that time were also part of Steven R. Dickey's estate at the time of his death and descended to me pursuant to . . . the Decree of Descent.").

[8] Plaintiff offers another possible reason for the omission: given the fact that both the '078 Patent and the '320 Patent share the same title, abstract, figures, and specification, Dickey's family may have referred to a single "patent" on the decree of death without realizing that the two patents were distinct documents.

Dickey's death. Monslow Aff. ¶ 4. Likewise, neither Ms. Dickey nor Armatas is aware of any transfer or assignment by Dickey prior to his death in 1999. Dickey Aff. ¶ 5; Armatas Aff. ¶ 7.[9] When weighed against a single statement that Concert was at one time concerned about the chain in title,[10] these affidavits are sufficient to demonstrate that Dickey owned his complete share of the interest in the Patents-in-Suit at the time of his death.

Cablevision also argues that the Decree of Descent raises a second question as to the transfer of interests in the Patents-in-Suit: whether or not the waivers of Dickey's children are valid under Kansas law.[11] The three waivers filed by Dickey's children state that each child "makes an irrevocable, unequivocal, complete and unqualified disclaimer, renunciation, and refusal to accept any and all interests in property which passes to [him or her] by intestate succession." Disclaimers of Lara Dickey, Arwen Dickey, and Steven Dickey, attached to Def.'s Reply at Ex. DD. Because the Decree of Descent, which lists all property that would pass to the children by intestate succession, does not refer to the '320 Patent, Cablevision argues that his children may not have renounced knowingly their interests in the '320 Patent since they may have been unaware that such interests existed. Accordingly, Cablevision continues, the waivers

---

[9] Cablevision finds fault with the Affidavit of Ms. Dickey because it does not describe her knowledge of her husband's business affairs. Therefore, Cablevision continues, her statement that to the best of her knowledge, Dickey did not transfer his interests carries little weight. The Affidavit of Monslow, however, has no such limitation. Because Dickey was required to seek Monslow's approval prior to transferring his interests, his assertion that Ms. Dickey was the sole heir is based on personal knowledge.

[10] The Court notes again that despite this concern, Concert did not rescind the sale.

[11] The Federal Circuit applies state law to determine the transfer of ownership upon the death of a patent owner. See Akazawa v. Ling New Tech. Int'l, Inc., 520 F.3d 1354, 1357 (Fed. Cir. 2008).

may be invalid as to the '320 Patent.[12]

The Court rejects this contention. The Kansas probate court previously found the waivers valid and determined intestate succession to Ms. Dickey based on the disclaimed interests. Because the 30-day limitation period for challenging the Decree of Descent has expired, see Kan. Stat. Ann. § 59-2213,[13] Cablevision's speculation about the possible defects of the disclaimers is mooted by the fact that the Decree of Descent cannot be challenged over eight years after its issuance. Accordingly, even assuming Dickey's children did not intend to waive their interests in the '320 Patent, they did not challenge the award of 100% of Dickey's property—including both Patents-in-Issue—to Ms. Dickey within the 30-day limitation period, and Cablevision cites no authority to show that they may do so now.

### C. Monslow's Father

In its final challenge to subject matter jurisdiction, Cablevision argues that in 1992, Monslow testified in his divorce proceeding that his father, Herbert Pete Monslow, possessed an eighteen percent interest in the Patents-in-Suit. As part of that proceeding, Monslow explained

---

[12] Accepting this argument, of course, would require the Court to ignore the "unqualified" disclaimer of "any and all interests in property" and substitute a condition that the waiver applied only to interests personally known to the three children at that time. Cablevision cites no case under Kansas law that would permit or require such a construction of unambiguous language.

[13] In pertinent part, Kan. Stat. Ann. § 59-2213 provides, "The [probate] court shall have control of its orders, judgments, and decrees for 30 days after the date of the rendition thereof. Thereafter such orders, judgments, and decrees may be vacated or modified as provided by [Kan. Stat. Ann. § 60-620(b)]." Section 60-620(b) provides a court with discretion to revisit a prior decision in cases of, inter alia, fraud, excusable neglect, or newly discovered evidence. Even then, however, a motion for relief must be made "within a reasonable time," and in some cases, no later than one year after the decision was rendered. Cablevision cites no case, and the Court can find none, in which a Kansas court afforded relief under section 60-620(b) over eight years after the time for challenging the probate court's decision expired.

that interests in the Patents-in-Suit were divided into a partnership and that "[t]he partners in that partnership are Steven Dickey who is also on the patent with me, a friend of mine, [Armatas], and my father." Dec. 21, 1992 Hr'g Tr. 43, attached to Def.'s Mot. at Ex. V.  When asked about the respective partnership interests between the parties, Monslow explained that "Dickey has a 15 percent interest, [Armatas] has a 15 percent interest, [and] my father has an 18 percent interest." Id.  Based on this statement, Cablevision argues that if Herbert Pete Monslow owned an eighteen percent interest in the Patents-in-Suit, there are several gaps in the chain of title as to if and how he transferred his interests to any of the individuals who assigned the patents to Concert.

Plaintiff responds that Herbert Pete Monslow's interest was only an interest in income rather than any interest in the Patents-in-Suit themselves.  As part of his May 7, 2007 deposition, Monslow testified that his father had a "second tier" interest in which "he would get a percentage of [Monslow's] proceeds due to investment." May 7, 2007 Dep. 27.  In contrast, Monslow explained that he, Dickey, and Armatas had a "first tier" interest in which each "had to step up to the plate and make representations and warranties as owner of the patent or those with direct ownership interests in the patent or to get the sale accomplished." Id. at 25.  In addition, Plaintiff has attached a Declaration from Herbert Pete Monslow in which he states, "In exchange for an eighteen percent (18%) economical interest in any economical proceeds that may accrue from the Patents, I invested money toward fees and/or expenses related to the Patents." Decl. of Herbert Pete Monslow ¶ 2, attached to Pl.'s Sur-Reply at Ex. R.  Further, he declares that he "never had and never expected to have a direct ownership interest in the Patents." Id. ¶ 3.  Accordingly, Plaintiff argues, Herbert Pete Monslow's former interest in income from the patent did not give

him the right to bring suit as a patent owner.  See, e.g., Gould v. Lumonics Research, Ltd., 495 F. Supp. 294, 296 (N.D. Ill. 1980) (finding that a party with an interest in income from the patent did not have an ownership interest and therefore had no right to sue for infringement).

Again unsatisfied by the evidence Plaintiff has produced, Cablevision contends that Plaintiff's failure to produce any documents reflecting the extent of Herbert Pete Monslow's partnership,[14] a declaration by Monslow explaining the alleged inconsistency between his 1992 statement and his 2007 statement, or a more thorough declaration from Herbert Pete Monslow[15] gives rise to an inference that any other existing evidence is harmful to Plaintiff's argument.  See Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.").  The Court finds that Herbert Pete Monslow's unequivocal statement, "I never had and never expected to have a direct ownership interest in the Patents" eliminates any ambiguity engendered by his son's testimony.  His lack of an ownership interest explains why, in nearly two decades in which the Patents-in-Suit were transferred back and forth between various

---

[14]   In 1992, when asked whether the partnership in the Patents-in-Suit was verbal or written, Monslow answered, "It's a verbal partnership.  I believe there are some documents reflecting that, but the partnership itself is verbal."  Dec. 21, 1992 Hr'g Tr. 43.  In 2007, he also stated that he had not "been back to look at documents" when attempting to recall whether his father had a twenty or eighteen percent interest in the Patents-in-Suit.  May 7, 2007 Dep. 24.

[15]   Cablevision finds fault with Herbert Pete Monslow's statement that he owned an eighteen percent economical interest in any proceeds from the Patents-in-Suit.  Cablevision contends that this statement contradicts the argument made in Plaintiff's response to the Motion in which Herbert Pete Monslow is alleged to have had an eighteen percent interest in only Monslow's share of the Patents-in-Suit.  The Court finds that this supposed contradiction is irrelevant to the issue before it: the question is not how much of a financial interest Herbert Pete Monslow had, but rather whether the interest was an ownership interest, a financial interest, or both.

parties, he has never appeared as a partial owner on any of the written assignments.  Under a preponderance of the evidence standard, the Court concludes that Herbert Pete Monslow's clear statement (corroborated by a supporting statement from his son) outweighs any evidentiary value attributed to a possibly contrary statement by Monslow and the absence of documentation reflecting the extent of his father's interest.[16]

## IV.  CONCLUSION

For the reasons discussed above, Cablevision's Motion will be denied.[17]  However, Cablevision has requested leave to conduct limited discovery as to Plaintiff's ownership of the Patents-in-Suit.  Although the Court is satisfied that jurisdiction is proper based on the evidence presented thus far, Cablevision suspects that a brief period of discovery could produce additional evidence proving that Plaintiff does not own all interests in the Patents-in-Suit.  Given that the jurisdiction question applies not only to this case, but to all actions in this Multidistrict proceeding, the Court will permit Cablevision the opportunity to conduct limited discovery in order to examine more fully what it perceives to be gaps in the chain in title.  An appropriate

---

[16]  With respect to the children of Dickey, Cablevision argues that Plaintiff failed to meet its burden by failing to submit written declarations from each child specifically disclaiming an interest in the '320 Patent.  Yet, Cablevision finds Herbert Pete Monslow's declaration—which <u>specifically</u> states that he <u>never</u> had an ownership interest in the Patents-in-Suit—inadequate.  Cablevision does not specify what other statement from Herbert Pete Monslow would satisfy Plaintiff's burden.

[17]  As an alternative to its 12(b)(1) Motion, Cablevision also argues that the action should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(7) for failure to join necessary parties.  However, as discussed above, the Court concludes that Plaintiff is the sole patent owner, and accordingly, Cablevision's argument that the remaining patent owners must be joined fails in light of the evidence presented.

Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: VTRAN MEDIA TECHNOLOGIES, LLC PATENT LITIGATION | : : : | MDL DOCKET<br><br>NO. 1948 |
| | | |
| VTRAN MEDIA TECHNOLOGIES, LLC | : : | CIVIL ACTION |
| v. | : : | NO. 08-3050 |
| ATLANTIC BROADBAND FINANCE, LLC d/b/a ATLANTIC BROADBAND, et al. | : : | |

## ORDER

     **AND NOW**, this    4th    day of November, 2008, upon consideration of Cablevision System Corporation's Motion to Dismiss and all responses thereto, and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the Motion is **DENIED**.  It is **FURTHER ORDERED** that Cablevision System Corporation shall have sixty (60) days from the date of this Order in which to conduct limited discovery on the issue of Plaintiff's ownership of the Patents-in-Suit.

                                                     BY THE COURT:

                                                     S/ BRUCE W. KAUFFMAN
                                                     **BRUCE W. KAUFFMAN,  J.**